# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **FOODCOMM INTERNATIONAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 02 C 7268** |
| | ) | |
| **PATRICK JAMES BARRY,** | ) | |
| **CHRISTOPHER PAUL LEACY, and** | ) | |
| **OUTBACK IMPORTS, INC., and** | ) | |
| **EMPIRE BEEF COMPANY, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Foodcomm International's ("Foodcomm") partial motion for summary judgment and on Defendants' partial motion for summary judgment. For the reasons stated below, we deny both motions for summary judgment in their entirety.

## BACKGROUND

Foodcomm alleges that in 1999 it hired Defendant Christopher Paul Leacy ("Leacy") to become its sales manager for the purchase and sale of Australian chilled beef in the United States. Foodcomm also contends that it hired Defendant Patrick

1

James Barry ("Barry") as a salesperson to assist Leacy. According to Foodcomm, as the work of Leacy and Barry progressed, they became more intricately involved in the dealings of Foodcomm and the level of their responsibilities expanded. In April 2001, Defendant Empire Beef Company, Inc. ("Empire") allegedly sent representatives to meet with Foodcomm representatives to discuss a redistribution agreement between Foodcomm and Empire ("Redistribution Agreement"). Foodcomm and Empire allegedly engaged in a series of negotiations concerning the Redistribution Agreement and Leacy and Barry were allegedly intimately involved in the negotiations. According to Foodcomm, in March of 2002, representatives of Empire became upset by a Foodcomm proposal and Leacy was sent to smooth over the problems with Empire. Foodcomm contends that while Leacy and Barry were still employed for Foodcomm they were secretly discussing doing business with Empire in Leacy's and Barry's own business, Defendant Outback Imports, Inc. ("Outback"), that Leacy and Barry were secretly putting in place. Specifically, Foodcomm claims that Leacy and Barry conspired to present Empire "with a business plan to create, Outback Imports, Inc., an Empire Beef-owned entity that would provide the same services as were already being provided by Foodcomm, and directly compete with Foodcomm." (Mem. FSJ 3-4). Foodcomm alleges that in July and August 2002, Barry began taking absences from work at Foodcomm and he resigned on August 29, 2002. Leacy allegedly then resigned on August 30, 2002. Foodcomm claims that Leacy and Barry were disloyal to Foodcomm by planning their new business and interfering with the relationship between Foodcomm and

Empire while Leacy and Barry continued to receive a salary from Foodcomm. Foodcomm's amended complaint includes a breach of fiduciary duty claim brought against Barry (Count I), a breach of fiduciary duty claim brought against Leacy (Count II), a breach of contract claim brought against Leacy (Count III), a constructive trust and unjust enrichment claim brought against Outback (Count IV), a civil conspiracy claim brought against all Defendants (Count V), and a constructive trust and unjust enrichment claim brought against Empire (Count VI).

Foodcomm now moves for summary judgment on the breach of fiduciary duty claims (Counts I and II) and on the civil conspiracy claim (Count V). Defendants have moved for summary judgment on the constructive trust and unjust enrichment claim brought against Outback (Count IV), the civil conspiracy claim to the extent that it is brought against Empire and Outback (Count V), and the constructive trust and unjust enrichment claim brought against Empire (Count VI). Defendants also move for summary judgment on the issue of damages resulting from lost profits.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). When there are cross motions for summary judgment, the court should "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.,* 400 F.3d 523, 526-27 (7th Cir.2005).

## DISCUSSION

I. Breach of Fiduciary Duty Claims (Counts I and II)

Foodcomm moves for summary judgment on the breach of fiduciary duty claims (Counts I and II).

A. Choice of Law for Breach of Fiduciary Duty Claims

Although Defendants make certain references to California state law in their answer to Foodcomm's motion for summary judgment, Illinois law clearly applies to the breach of fiduciary duty claims in this action. Such a determination has already been made in this action by the Seventh Circuit in *Foodcomm Int'l. v. Barry*, 328 F.3d 300 (7th Cir. 2003). *Id.* at 304. After this court entered a preliminary injunction in this case, Defendants appealed the ruling and the Seventh Circuit affirmed this court's ruling in *Foodcomm*. *Id.* at 303. The Court in *Foodcomm* noted that "[t]he parties implicitly agree that Illinois law applies to Foodcomm's claims." *Id.* The Court also applied Illinois law when determining whether Barry and Leacy were fiduciaries and whether they violated their fiduciary duties. *Id.* at 304. Thus, Illinois law applies to the breach of fiduciary duty claims in this action.

B. Whether Barry and Leacy were Fiduciaries

Foodcomm argues that there is conclusive evidence that shows that Barry and Leacy were fiduciaries of Foodcomm.

1. Whether Prior Ruling Resolved Issue

Foodcomm argues that the Court in *Foodcomm*, has already found that Leacy and Barry were fiduciaries of Foodcomm. In *Foodcomm* the Court addressed Defendants' argument that Barry and Leacy were not fiduciaries and the Court stated: "We disagree." *Id.* In support of its conclusion, the Court pointed to pieces of evidence that indicate that Barry and Leacy were fiduciaries of Foodcomm and the Court concluded by stating: "These are the hallmarks of a fiduciary, and employees, as agents of their employer, do not fall outside the purview of a breach of fiduciary duties." *Id.* Defendants contend that the statements made by the Court in *Foodcomm* were merely based upon the record before the Court at that juncture, and were not intended to bind the parties or this court at the summary judgment stage.

The Seventh Circuit has indicated that "[a] court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment . . . .'" *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291-92 (7th Cir. 1998)(noting that "findings of fact and conclusions of law made at the preliminary injunction stage are often based on incomplete evidence and a hurried consideration of the issues; and second, different standards apply in the two contexts (reasonable likelihood of success on an injunction, and the existence of any genuine issues of material fact on summary judgment)"). In the instant action, the Court in *Foodcomm* did not specifically state that its conclusion that Barry and Leacy were fiduciaries was a preliminary finding, but the context of the statements by the Court indicates that its conclusion was only a preliminary finding. For example, in

*Foodcomm*, the Court made clear that it was not ruling on the merits of Foodcomm's claims by stating that it was applying the legal standard for a preliminary injunction determination. 328 F.3d at 303. Also, immediately after the Court discussed whether Barry and Leacy were fiduciaries, the Court made several references to the fact that the Court was ruling based upon "evidence adduced at the [preliminary injunction] hearing" and that certain facts appeared to support Foodcomm's positions "if proved at trial." *Id.* There is no clear statement by the Court in *Foodcomm* indicating that it intended to depart from the general principal regarding preliminary injunction findings and to bind the court and parties at the summary judgment stage in regards to whether Leacy and Barry were fiduciaries of Foodcomm. Thus, we conclude that the Seventh Circuit did not bar the parties from addressing this issue at the summary judgment stage.

### 2. Evidence of a Fiduciary Relationship

Foodcomm argues that the evidence overwhelmingly shows that Barry and Leacy were fiduciaries of Foodcomm. Under Illinois law, a plaintiff bringing a breach of fiduciary duty claim bears "[t]he burden of proving the existence of a fiduciary relationship . . . ." *In re Rothenberg*, 530 N.E.2d 1148, 1150 (Ill. App. Ct. 1988). A fiduciary relationship may: 1) "be presumed from the relationship of the parties, such as in an attorney-client relationship," or 2) "arise from the facts of particular situation, for example, where there is trust reposed on one side and resulting superiority and influence on the other." *Id.* If a fiduciary relationship is not

presumed as a matter of law "the facts from which such a relationship arises must be proved by clear and convincing evidence." *Id.*

In *Foodcomm* the court noted that, based upon the record before it at that juncture, Barry and Leacy appeared to have "had exclusive charge over all of Foodcomm's purchasing of Australian chilled beef, and their job descriptions at Foodcomm involved significant autonomy and discretion." 328 F.3d at 304. The Court in *Foodcomm* also noted that "Barry and Leacy were two of Foodcomm's highest paid employees . . . ." *Id.*

### a. Salaries

Foodcomm argues that, apart from the owners of Foodcomm, Leacy and Barry were Foodcomm's highest paid employees. Defendants deny in part Foodcomm's assertion. Defendants cite a chart of Foodcomm employees' salaries that indicates that, besides Leacy, in 2002 four other non-owner employees made more money than Barry. (R FSF Par. 38)(R FSF Tab 12). Defendants concede that Leacy was the highest paid employee other than the owners. Thus, whether Barry was one of Foodcomm's highest paid employees is a genuinely disputed fact. Also, the mere fact that Leacy received a high salary is not sufficient to warrant a finding as a matter of law that he was a fiduciary. Foodcomm will have an opportunity to present evidence concerning the salaries of Leacy and Barry at trial before the trier of fact.

### b. Responsibilities of Leacy and Barry

Foodcomm also claims that Leacy and Barry had significant responsibilities in their jobs and had exclusive control over the purchasing of Australian chilled beef. Foodcomm asserts that it hired Leacy as its exclusive Sales Manager for importing Australian chilled beef. (FSF Par. 23). Defendants dispute Foodcomm's characterization of Leacy's position as a Sales Manager and contend that Leacy was merely hired as a salesman. (R FSF Par. 23). Defendants contend that Leacy did not have exclusive control over the purchasing of beef and point to Leacy's deposition testimony during which Leacy testified that he only handled about 70 percent of the purchasing and that Greg Bourke ("Bourke"), the Vice President of Foodcomm, handled 30 percent of the purchasing. (Leacy Dep. 27-28). Foodcomm in response points to Bourke's declaration which indicates that the responsibilities of Barry and Leacy expanded until they dealt with all purchasing and that they handled 100 percent of the purchasing when their employment with Foodcomm ended. (Bourke Decl. Par 8). Defendants acknowledge that the responsibilities of Leacy and Barry expanded somewhat during their employment, but disagree with Bourke's contention that they handled 100 percent of purchasing when they left Foodcomm. Foodcomm, has not pointed to any conclusive evidence that shows that Bourke's contentions regarding purchasing are accurate and Leacy's deposition testimony on the subject is inaccurate. Thus, whether Leacy and Barry had exclusive control over the purchasing of Australian chilled beef is a determination that must be made by the trier of fact. *See Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003)(stating that at the summary judgment stage "a court may not make credibility determinations,

weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder'").

In addition, we note that Defendants point to a variety of other evidence that creates genuinely disputed facts concerning the scope of the other responsibilities of Leacy and Barry when they terminated their employment with Foodcomm.  (R FSF Par. 23, 32, 44).  A determination of what those responsibilities entailed would be pertinent in order to assess whether Leacy and Barry had formed a fiduciary relationship with Foodcomm.  Thus, because there are genuinely disputed facts, we cannot determine what were the responsibilities of Leacy and Barry at the time of their departure from Foodcomm.  Such a determination can only be made by the trier of fact.


    c. Discretion and Autonomy

Foodcomm argues that Leacy and Barry had significant discretion and autonomy in performing their work for Foodcomm.  As is indicated above, there are genuinely disputed facts concerning the scope of the responsibilities of Leacy and Barry.  Such a determination concerning their responsibilities would be relevant for a determination in regards to the amount of discretion or autonomy they had in performing those responsibilities.  Foodcomm characterizes Leacy and Barry as its representatives, acting as the sole arm of Foodcomm in dealing with Empire, while being vested with autonomy to carry out their duties.  Defendants, however, point to evidence that indicates contrary facts.  Defendants point for example, to evidence

that indicates that Bourke took an active role in maintaining Foodcomm's relationship with Empire. (R FSF Par. 44). If Bourke was actively involved in ensuring that Foodcomm maintained a cordial relationship with Empire then the work of Leacy and Barry dealing with Empire would likely have been monitored and controlled by Bourke. Although there is no conclusive evidence that proves such a fact to be true or untrue, we are required to make all reasonable inferences in favor of Defendants, the non-movants on this issue. *Anderson*, 477 U.S. at 255. Defendants also point to the deposition testimony of Bourke during which he indicated that Frank Tarantino "had the responsibility for overseeing what Mr. Barry and Leacy . . . did" in "some instances." (Bourke Dep.40, 61). Bourke indicated that Barry and Leacy worked more independently than with Tarantino, but did not assert that Barry and Leacy had unfettered autonomy in their work. (Bourke Dep. 61). In response to the evidence cited by Defendants showing that Leacy and Barry did not have autonomy and broad discretion in performing their jobs, Foodcomm fails to point to any evidence that would conclusively show otherwise. Foodcomm merely relies upon the Court's statements in *Foodcomm* which were based on the limited record before the court at that juncture. Thus, a determination concerning the discretion and autonomy that Leacy and Barry had in their jobs can only be made by the trier of fact. Based on the above, and a consideration of all the evidence as to whether Leacy and Barry were fiduciaries of Foodcomm, we conclude that such a determination cannot be resolved as a matter of law at this juncture.

<u>C. Whether Leacy and Barry Breach their Fiduciary Duties</u>

Foodcomm argues that Leacy and Barry breached their fiduciary duties. Under Illinois law, in order to prevail on a breach of fiduciary duty claim a plaintiff must establish: 1) "the existence of a fiduciary duty on the part of" the plaintiff, 2) that the defendant breached that duty, and 3) "damages proximately resulting therefrom." *Romanek v. Connelly*, 753 N.E.2d 1062, 1072 (Ill. App. Ct. 2001). Since, as is explained above, we cannot determine as a matter of law whether Leacy and Barry were fiduciaries of Foodcomm, we need not proceed further with our analysis of the breach of fiduciary claims. Foodcomm cannot prevail on their motion for summary judgment on the breach of fiduciary claims without a finding that Leacy and Barry were fiduciaries of Foodcomm.

We also note that even if Foodcomm had pointed to sufficient evidence that indicates Leacy and Barry were fiduciaries, there are a variety of genuinely disputed facts that bear upon the determination of whether Leacy and Barry breached their alleged fiduciary duties. For example, Foodcomm contends that Leacy and Barry conspired to present Empire "with a business plan to create, Outback Imports, Inc., an Empire Beef-owned entity that would provide the same services as were already being provided by Foodcomm, and directly compete with Foodcomm." (Mem. FSJ 3-4). However, Foodcomm fails to specifically point to any evidence that would support such a conclusion. Foodcomm as the movant bears the burden of pointing to such evidence that shows that it is entitled to prevail as a matter of law. *See Celotex Corp.*, 477 U.S. at 323 (stating that in seeking a grant of summary judgment the

moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact")(quoting Fed. R. Civ. P. 56(c)).   In support of Foodcomm's allegations of conspiratorial conduct by Leacy and Barry, Foodcomm points vaguely to broad ranges of its statement of facts.   One such citation covers a range of over forty paragraphs and other citations cover twenty paragraphs of the statement of material facts.   (Mem. FSJ 4).   Such a broad reference to the statement of facts would include countless pieces of evidence that are cited in support of the many paragraphs.   Local Rule 56.1 was designed to assist the courts by making the record clearer and less burdensome for a court to identify genuinely disputed material facts.   Such a purpose would be entirely defeated if a party could, as Foodcomm has done, simply point abstractly to broad portions of a statement of material facts and argue that somewhere in that morass of facts and evidence there is some evidence that supports its position.   *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920, 922 (7th Cir. 1994)(stating that a court is not "obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions").   Thus, Foodcomm has failed to meet its burden to identify sufficient evidence that shows that it is entitled to a judgment as a matter of law on the issue of whether Leacy and Barry breached their alleged fiduciary duties.

Defendants on the other hand have pointed to evidence that indicates that there are genuinely disputed facts concerning whether Leacy and Barry breached their

alleged fiduciary duties. For example, Foodcomm contends that Leacy was attempting to hide from Foodcomm his secret business discussions with Empire. To support its point, Foodcomm states that in March 2002 Leacy told Bourke that only Leacy would have further contact with Empire and that Leacy told Bourke that he should not have contact with Empire. (FSF Par. 75). However, the only support that Foodcomm cites for such a proposition is the testimony of Bourke at the preliminary injunction hearing. (FSF Par. 75). Defendants point out that a close examination of Bourke's testimony shows that Foodcomm's characterization of his testimony is inaccurate. Bourke testified that Leacy told him that Leacy would contact Empire to "smooth things over." (Prelim. Hearing 174). Bourke then was asked whether he and Leacy "agreed" that Leacy should contact Empire instead of Bourke and Bourke did not deny that characterization of the decision. (Prelim. Hearing 174-75). It is not clear from such testimony whether it was Leacy who came up with the idea that only he should have contact with Empire or whether Bourke and Leacy who reached an agreement together. Although either inference is possible, we are required to make such inferences in favor of Defendants, the non-movants on this issue. *Anderson*, 477 U.S. at 255. Foodcomm improperly presents facts that are based upon inferences in its favor.

In addition, Foodcomm tries to show that Leacy was secretive and breached his fiduciary duties by arguing that Leacy never told Bourke or anyone else at Foodcomm that Empire decided to stop doing business with Foodcomm. (FSF Par. 78). Defendants admit the truth of that fact, but point to evidence that shows that

14

there was no need for Leacy to inform Foodcomm of that fact because the relations between Empire and Foodcomm had already broken down and Bourke had recognized that the decision by Empire to cease its relations with Foodcomm was a foregone conclusion. (R FSF Par. 78). Whether or not Foodcomm is correct or Defendants are correct, and which inferences should be made from the evidence is a matter that can only be determined by the trier of fact. Therefore, whether Leacy and Barry breached their alleged fiduciary duties is a matter that must be addressed by the trier of fact. Based on the above, we deny Foodcomm's motion for summary judgment on the breach of fiduciary claims (Counts I and II).

## II. Civil Conspiracy Claims (Count V)

Foodcomm moves for summary judgment on Foodcomm's claim against Defendants for civil conspiracy. Empire and Outback also seek summary judgment on Foodcomm's civil conspiracy claim.

### A. Civil Conspiracy Choice of Law

When a federal court has diversity subject matter jurisdiction in a case and does not have federal question subject matter jurisdiction, the court must apply "the choice-of-law rules of the forum state . . . ." *Smurfit Newsprint Corp. v. Southeast Paper Mfg.*, 368 F.3d 944, 949 (7th Cir. 2004). The parties do not disagree that this court solely has diversity subject matter jurisdiction and that the instant action was brought in federal court in Illinois. Therefore, we must look to Illinois state law for

choice of law principles.

Empire and Outback argue that California law should be applied in determining Foodcomm's civil conspiracy claims. The Seventh Circuit noted that "[t]he parties implicitly agree[d] that Illinois law applies to Foodcomm's claims." *Foodcomm*, 328 F.3d at 303. However, following the Seventh Circuit's direction, we must apply Illinois law. Even if the Seventh Circuit's ruling in its earlier decision does not apply in the instant action, in Illinois, the "most significant relationship test" is used to decide between conflicting laws. *Palmer v. Beverly Enterprises*, 823 F.2d 1105, 1112 (7th Cir. 1987); *Ingersoll v. Klein*, 262 N.E.2d 593, 595-96 (Ill. 1970). Under the most significant relationship test, "the local law of the State where the injury occurred should determine the rights and liabilities of the parties, unless Illinois has a more significant relationship with the occurrence and with the parties, in which case the law of Illinois should apply." *Ingersoll*, 262 N.E.2d at 595. When determining which state has a more significant relationship, the court considers: (1) where the injury occurred; (2) where the injury causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered. Additionally, the court should look at the contacts of each jurisdiction under the factors and evaluate those contacts in light of the policies underlying the laws of those jurisdictions.

In the instant action, the alleged civil conspiracy between the Defendants has a more significant relationship to Illinois. First, Barry and Leacy solicited each other in Illinois. Second, Barry and Leacy at times solicited Empire while in Illinois.

Third, Barry and Leacy prepared their business plan on Foodcomm's computers in Illinois.  Fourth, the Defendants intended to form Outback in Illinois.  Fifth, Outback's headquarters and sole office was located in Chicago, Illinois.  Sixth, on or about September 18, 2002, Foodcomm learned that Barry and Leacy were "trading for or from a New firm in Chicago called Outback Imports," (FSAF Par. 104), and on October 2, 2002, Barry solicited business by sending an email announcing that he had "launched a company . . . in partnership with Chris Leacy . . . based in Chicago[, Illinois] . . . called Outback Imports . . . ."  (FSAF Par. 105).  Seventh, Barry and Leacy were domiciled in Illinois at the time the complaint was filed.  Finally, even when Barry and Leacy worked solely for the Outback Imports division of Empire, Barry and Leacy worked in Illinois.  Therefore, since the alleged breach of fiduciary duties by Barry and Leacy occurred in Illinois, the alleged civil conspiracy occurred in Illinois, Barry, Leacy, and Outback were domiciled in Illinois, and the relationship between Foodcomm and the Defendants is centered in Illinois, Illinois law applies to the civil conspiracy claim.  *See, e.g., Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999)(stating that "[the location that the tort occurred] is the place that has the greatest interest in striking reasonable balance among safety, cost, and other factors pertinent to the design and administration of a system of tort law").

Empire and Outback argue that Illinois applies the "internal affairs doctrine" in determining the appropriate choice of law, which would then require this court to apply California law to the civil conspiracy claim.  (D. Mot. 4).  Under Illinois law, the "internal affairs doctrine" is only applicable "[w]hen the subject is liability of

officers and directors *for their stewardship of the corporation*, the law presumptively

applicable is the law of the place of incorporation." *Resolution Trust Corp. v.

Chapman*, 29 F.3d 1120, 1122 (7th Cir.1994)(emphasis added). Empire and Outback

contend that "Foodcomm attempts to hold Empire and Outback liable for alleged

breaches of fiduciary duty by Barry and Leacy under a civil conspiracy theory" and

that the "internal affairs doctrine" should be applied. (Mem. DSJ 3, 4). However,

Foodcomm's claim in Count V is not a breach of fiduciary duties claim, but rather a

tort claim where alleged breaches of fiduciary duties by Barry and Leacy are an

element of the cause of action. *See McClure v. Owens Corning Fiberglas Corp.*, 720

N.E.2d 242, 258 (Ill. 1999)(stating that "[c]ivil conspiracy is an intentional tort . . .

."). Therefore, as a matter of law, Illinois law applies to Foodcomm's civil

conspiracy claim.


### B. Summary Judgment on Civil Conspiracy Claims

Foodcomm and Defendants contend that they are entitled to judgment as a

matter of law as to the civil conspiracy claims.

Foodcomm contends that each of the elements for civil conspiracy "are readily

satisfied here on the undisputed evidence. (Mem. PSJ 5). Under Illinois law, a civil

conspiracy is defined as: "(1) a combination of two or more persons, (2) for the

purpose of accomplishing by some concerted action either an unlawful purpose or a

lawful purpose by unlawful means, (3) in the furtherance of which one of the

conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807

N.E.2d 461, 470 ( Ill. 2004).  In order to be liable of civil conspiracy, the conspiracy must be "in furtherance of . . . *an overt tortious or unlawful act*."  *Id*. at 470 (emphasis added).  In order for Barry and Leacy to further their breaches of fiduciary duties, Barry and Leacy must first owe fiduciary duties to Foodcomm.  As noted earlier in this opinion, based on the facts and a review of the evidence, the issue of whether Barry and Leacy owed fiduciary duties to Foodcomm cannot be resolved as a matter of law.  Therefore, because the issue of the existence of fiduciary duties by Barry and Leacy must be decided by a trier of fact, liability as to Foodcomm's civil conspiracy claim cannot be decided as a matter of law.

Additionally, Empire and Outback argue that Foodcomm cannot meet the legal requirements for civil conspiracy because Foodcomm cannot demonstrate that Empire and Outback had actual knowledge that Barry's or Leacy's conduct constituted breaches of their fiduciary duties.  Civil conspiracy is an intentional tort that requires proof that a defendant "knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." *Adcock*,  645 N.E.2d at 894.  However, accidental, inadvertent, or negligent participation in a common scheme does not amount to a civil conspiracy.  *Id*.  Simply knowing of the fraudulent or illegal actions of another is also not enough to show a conspiracy, *Tribune Co. v. Thompson*, 174 N.E. 561 (1930), and "[a] defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Adcock*,  645 N.E.2d at 894.  Empire and Outback contend that Foodcomm cannot satisfy its burden to show

that Empire and Outback had actual knowledge of "fiduciary duties owed by Barry and Leacy to Foodcomm" and "any conduct in violation of those duties." (Mem. DSJ 6).

Empire and Outback contend that to have such actual knowledge, Empire and Outback must understand the nature of Barry's or Leacy's alleged duties and the breaches of those duties. Under Illinois law, "[a] defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives, . . . is liable as a conspirator." *Adcock*, 645 N.E.2d at 894. Foodcomm notes that conspiracy claims "do no rise or fall based upon a co-conspirator's legal acumen." (Resp. DSJ 6)(citing *United States v. Snook*, 366 F.3d 439, 445 (7th Cir. 2004), for the proposition that "on the conspiracy count the government need not prove Snook knew the practice was illegal"). Empire and Outback must have simply understood "the general objectives" of the civil conspiracy scheme to breach the alleged fiduciary duties, accept those objectives, and agree with the objectives, either explicitly or implicitly, to further the objectives of breaching the alleged fiduciary duties. Simply because Empire and Outback did not understand the legal terminology or the details of the law, they are not shielded from liability.

Empire and Outback also argue that the individuals responsible for hiring Barry and Leacy "had no idea that Barry and Leacy allegedly owed fiduciary duties to Foodcomm." (Mem. DSJ 6). Additionally, Empire and Outback contend that the individuals responsible for hiring Barry and Leacy "did not have any occasion to

explore the duties of Barry and Leacy to Foodcomm because, as Levine testified, he was 'hiring two good salesmen to sell meat to [Empire's] existing account base.'" (Mem. DSJ 6). However, knowledge by Empire that: Barry and Leacy were Foodcomm's employees; Leacy was in charge of the Empire account; and Leacy was involved in business negotiations between Foodcomm and Empire could lead a trier of fact to conclude that the actions of Empire and Outback were an implicit agreement to further Barry's and Leacy's breach of their alleged fiduciary duties. Additionally, a trier of fact could conclude that receiving the business plan from Barry and Leacy, seeking legal advice from Empire's attorney about Leacy's confidentiality agreement with Foodcomm, financing Outback, and distributing shareholder agreements to Barry and Leacy could constitute agreement to further the alleged breaches of fiduciary duties by Barry and Leacy. Further, a trier of fact could conclude that an agreement, either explicit or implicit, in furtherance of a breach of the alleged fiduciary duties by Barry and Leacy did not exist. *See Adcock*, 645 N.E.2d at 894 (noting that the agreement is "a necessary and important" element the civil conspiracy cause of action). Thus, the question of whether Outback knew of Leacy's and Barry's alleged fiduciary duties is for the trier of fact to answer.

Additionally, Empire and Outback contend that "Outback never functioned as a corporate entity" and therefore summary judgment must be decided in their favor. (Mem. DSJ 6). However, Empire and Outback note that "Quinn (Empire's controller) signed the lease [for Outback's offices] and Empire paid the rent [for Outback's offices]." (Reply DSJ 10 n. 9). Additionally, a shareholder agreement

and stock option agreement for Barry and Leacy to become shareholders in Outback was created. (FSAF Par. 84). Further, a Certificate of Incorporation for "Outback Imports, Inc." was filed with the New York Secretary of State on July 31, 2002. (FSAF Par. 85). In addition to the certificate of incorporation, on or about September 18, 2002, Foodcomm learned that Barry and Leacy were "trading for or from a New firm in Chicago called Outback Imports," (FSAF Par. 104), and on October 2, 2002, Barry sent an email announcing that he had "launched a company . . . in partnership with Chris Leacy . . . based in Chicago . . . called Outback Imports . . ." (FSAF Par. 105). Although Empire and Outback contend that "Outback never commenced business," (Mem. DSJ 7-8), and that Outback was merely a shell corporation, questions of fact remain as to whether there were any profits, and if so, whether any went directly to Outback or to the Outback Imports division of Empire. Thus, even if the trier of fact concludes that Barry and Leacy breached their alleged fiduciary duties, and that Empire and Outback expressly or implicitly participated in the alleged conspiracy, material facts still remain as to whether Outback operated as a business, or was merely a shell for Empire. Therefore, based on the above, we deny the motions for summary judgment by Foodcomm and the Defendants on the civil conspiracy claims (Count V).

III. Causation

Foodcomm argues that Defendants "caused injury to Foodcomm in the form of loss of employee loyalty and loss of the ability to pursue the Empire Beef

redistribution deal unencumbered by its own disloyal employees." (Mem. FSF 6).
In regards to the alleged harm to Foodcomm resulting from a "loss of employee
loyalty," Foodcomm has not pointed to sufficient evidence that conclusively
establishes causation for any such damages and which would warrant granting
judgment as a matter of law in favor of Foodcomm on that issue. In regards to the
alleged harm to Foodcomm caused by the loss of its relationship with Empire,
Defendants have pointed to a variety of evidence that indicates that Defendants'
alleged misconduct, even if true, did not cause such harm to Foodcomm.

For example, there is evidence that indicates that Empire was contemplating
severing its relationship with Foodcomm even before Leacy and Barry engaged in
their alleged secretive communications with Empire. Such evidence makes it
possible to infer that the ultimate decision by Empire to sever relations was based
upon the dealings that occurred prior to Leacy's and Barry's alleged misconduct.
The parties agree that in March 2002 a conflict arose in the negotiations between
Foodcomm and Empire and that Leacy was sent in to try and smooth out the
problems. (FSF 72-73). Foodcomm contends that Empire's representative became
upset during the negotiations over the Redistribution Agreement. (FSF Par. 71).
However, Foodcomm does not indicate that the conflict was caused by Leacy or
Barry attempting to interfere with Foodcomm's relationship with Empire. Rather,
Foodcomm admits that the Empire representative was "upset with Bourke due to
Bourke's suggestions at the March 12 meeting that Foodcomm broker Empire Beef's
purchases from ConAgra/AMH as part of the redistribution deal." (FSF Par. 71).

Bourke, Foodcomm's General Manager, testified at his deposition that the Empire representative "was pretty upset" and described the situation as a "hornet's nest." (Bourke Dep. 192, 197-98). Thus, only the trier of fact can determine whether Empire decided to sever its relationship with Foodcomm based upon the animosity caused by Bourke rather than based upon any alleged secretive contacts by Leacy and Barry.

Defendants also point to other evidence that indicates that their contacts with Empire were not the cause of Empire's decision to terminate its relationship with Foodcomm. Defendants argue that Leacy and Barry did not approach Empire to discuss doing business with Empire until May 2002 and that Empire had already indicated its decision to terminate its relations with Foodcomm by that juncture. Scott Brubaker ("Brubaker"), a representative of Empire, testified at his deposition that he spoke with Bourke in September 2002 and that during that conversation Brubaker told Bourke that Empire was "no longer going to do business" with Foodcomm. (Brubaker Dep. 336). Bourke himself testified that when he spoke with Brubaker in September 2002 about reviving the Redistribution Agreement negotiations, Brubaker told him "that door was - - is now closed . . . ." (Bourke Dep. 365). Defendants also point to evidence that shows that Leacy and Barry did not approach Empire to discuss doing business with Empire until May 2002. (DSF Par. 81-83). Although Foodcomm contends that Leacy and Barry secretly engaged in improper contacts with Empire sooner than May 2002, such a determination cannot be made as a matter of law. Only the trier of fact can assess the evidence concerning

24

Leacy's and Barry's alleged misconduct and determine whether they acted improperly, and if they did so, when such conduct took place. Finally, Defendants point out that even if there is sufficient evidence that shows that there was a remote possibility after September 2002 that Empire might rekindle its relationship with Foodcomm, Foodcomm cannot automatically place the blame on Leacy and Barry for the final breakdown in its relations with Empire. Foodcomm itself put a damper on such a possible rekindling by suing Empire in the instant action in October of 2002. Thus, there are genuinely disputed facts concerning causation in the instant action that can only be addressed by the trier of fact.

## IV. Damages

Foodcomm argues that it is entitled to partial summary judgment on the issue of damages. Defendants argue that Foodcomm is barred from seeking any compensatory damages for lost profits and that regardless, such damages are speculative and cannot be calculated.

### A. Whether Foodcomm is Barred from Recovering Lost Profits

Defendants argue that Foodcomm is barred from recovering any damages for lost profits.

#### 1. Omission of Request in Amended Complaint

Defendants argue that since Foodcomm did not specifically request

compensatory damages in the amended complaint, "Foodcomm has no legal right to claim any compensatory damages for the loss of Empire business." (Mem. DSJ 9). However, in support of such a statement, Defendants fail to cite to any legal authority whatsoever. (Mem. DSJ 9). Federal Rule of Civil Procedure 54(c) states in pertinent part, "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in the party's pleadings*." Fed. R. Civ. P. 54(c)(emphasis added). Federal Rule of Civil Procedure 8 ("Rule 8") requires a plaintiff to include in its complaint a clear and concise statement of its claims, jurisdictional allegations, and a demand for relief. Fed. R. Civ. P. 8. Rule 8 does not specify that the demand for relief included in the complaint is the only relief available to a plaintiff. Fed. R. Civ. P. 8.

In the amended complaint, Foodcomm seeks: 1) preliminary and permanent injunctions barring Barry and Leacy from working for Empire and Outback, 2) a forfeiture of Barry's and Leacy's compensation during the last months of their employment at Foodcomm, and 3) punitive damages. (R DSF Par. 70). Foodcomm does not specifically ask for compensatory damages in the amended complaint. (R DSF Par. 10). However, for each count in the amended complaint, Foodcomm requested that the court "award such further relief as [the] Court deems appropriate under the circumstances." (A. Compl. Par. 57, 63, 71, 76, 81, 85). Compensatory damages would thus be included within the request for "further relief" included in the amended complaint, and the trier of fact must determine the amount of such

damages, if any.

To the extent that Defendants are contending that they were surprised by the allegedly untimely request for compensatory damages, Defendants have not shown that they were prejudiced by the request. Defendants admit that Foodcomm disclosed its intent to seek such damages in January of 2004 and Defendants did not subsequently file any motion with this court seeking additional discovery concerning compensatory damages. Two years later, in September 2006, after this case returned from an appeal, Defendants appeared before this court and still made no mention of any complaint on Foodcomm's intent to seek compensatory damages. Instead, Defendants and Foodcomm agreed that the court proceed and rule based upon the summary judgment briefs that were previously filed with the court. Thus, based on the above, Defendants have failed to show that Foodcomm is barred from pursuing compensatory damages in the instant action merely because there is not a specific request for such damages in the amended complaint.

## 2. Whether the Request for Damages is Speculative and Incalculable

Defendants further argue that even if compensatory damages for lost profits are available to Foodcomm, this court should find as a matter of law that no compensatory damages for lost profits can be awarded because Foodcomm's request for compensatory damages is speculative and cannot be calculated. Lost profits can be recovered when a party can prove the calculated amount "with sufficient certainty to avoid speculation or conjecture by the jury." *Shepard v. State Auto. Mut. Ins. Co.*,

463 F.3d 742, 748 (7th Cir. 2006).

### 3. Expert Calculations

Defendants argue that Foodcomm's expert's calculations regarding lost profits are speculative. Drawing all inferences in favor of Foodcomm, the non-movant on this issue, we conclude that Foodcomm has presented sufficient evidence such that a reasonable jury could possibly, without speculation or conjecture, award Foodcomm lost profits as compensatory damages. It is up to the trier of fact to assess accuracy of the calculations of Foodcomm's experts, and to determine how much damages, if any, should be awarded. Foodcomm should be allowed to present its evidence at trial concerning compensatory damages for lost profits and it is premature to conclude prior to trial that such evidence would be insufficient as a matter of law.

### 4. Legal Findings in *Foodcomm*

Defendants argue that in *Foodcomm* the Court determined as a matter of law that the lost profits resulting from Foodcomm's separation from Empire cannot be calculated. Defendants point to the elements for a preliminary injunction that require a finding of irreparable harm and no adequate remedy at law. Defendants contend that the Court's statements in *Foodcomm* in regard to those elements show that damages resulting from Foodcomm's separation from Empire and lost profits cannot be calculated. However, the court in *Foodcomm* was solely reviewing the district court's ruling granting Foodcomm's motion for a preliminary injunction. 328 F.3d at

302. The type of harm that the preliminary injunction was meant to address was the harm that Barry and Leacy could cause Foodcomm by continuing to work with Empire and Outback. The preliminary injunction preserved the status quo in regard to Leacy's and Barry's further conduct. Thus, in regards to the irreparable harm and inadequate remedy at law elements, the issue was whether injunctive relief was necessary to stop Leacy and Barry from causing further harm to Foodcomm or whether Foodcomm could later calculate damages caused by Leacy's and Barry's further contact with Empire.

The preliminary injunction order did not order Empire to retain its relationship with Foodcomm in order to preserve the status quo in that regard. The court was not presented with a determination of whether Foodcomm would suffer irreparable harm and lack a remedy at law if an injunction was not issued to order Empire to retain its relationship with Foodcomm. Thus, Defendants are incorrect when they assert that the Court in *Foodcomm* ruled as a matter of law that the lost profits that resulted from the separation between Foodcomm and Empire cannot be calculated. That issue was never before the Court. Based upon the above, Defendants have failed to show that Foodcomm is barred from recovering compensatory damages for lost profits.

We are not finding that Foodcomm is entitled to recover damages. We are merely ruling that Foodcomm is entitled to present its evidence concerning damages at trial. If at the close of Foodcomm's case in chief Foodcomm has failed to present sufficient evidence concerning damages, Defendants are entitled to move for a

judgment as a mater of law pursuant to Federal Rule of Civil Procedure 50(a). Fed. R. Civ. P. 50(a).

## B. Partial Judgment on Issue of Damages

Foodcomm argues that it is entitled to summary judgment "as to damages reflecting the compensation paid to Barry and Leacy during their period of disloyalty." (Mem. FSJ 12). Foodcomm contends that during the time it has determined that Leacy and Barry were disloyal to Foodcomm Leacy was paid $92,500 and Barry was paid $53,837. Foodcomm contends that it is entitled to a judgment as a matter of law as to such damages. However, as is indicated above, whether Leacy and Barry were in fact disloyal to Foodcomm and whether Foodcomm is entitled to prevail on any of its claims is a matter yet to be determined by the trier of fact. Also, even if the trier of fact concluded that Leacy and Barry were disloyal to Foodcomm, there are genuinely disputed facts concerning the precise period that Leacy and Barry were disloyal. Finally, Foodcomm has failed to point to sufficient evidence that shows that Leacy and Barry failed to offer Foodcomm any benefit at all during the alleged period of disloyalty. If Leacy and Barry offered some benefits to Foodcomm, then Foodcomm should not be entitled out of hand to recover their entire salaries and unjustly benefit from the services provided by Leacy and Barry. Thus, even if the trier of fact determines that Leacy and Barry were disloyal and further determines the period of such disloyalty, the trier of fact needs to assess further evidence to determine whether Foodcomm is entitled

to recover all or part of their salaries during that period.  Therefore, we deny Foodcomm's partial motion for summary judgment on damages.


## V. Constructive Trust and Unjust Enrichment Claims (Counts IV and IV)

Empire and Outback move for summary judgment on the Constructive trust and unjust enrichment claims (Counts IV and VI).  Under Illinois law, a constructive trust is an equitable remedy that may be imposed to redress unjust enrichment where there is either actual fraud or implied fraud resulting from a fiduciary relationship. *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 638 (Ill. 1977); *see also Ray v. Winter*, 367 N.E.2d 678, 682 (Ill. 1977)(noting that "[c]onstructive trusts are divided into two general classes: one in which actual fraud is considered as equitable grounds for raising the trust, and the other, where there exists a fiduciary relationship and a subsequent abuse of such relationship").  Empire and Outback contend that they are entitled to summary judgment on Foodcomm's unjust enrichment claims since Empire and Outback did not actively participate in or knowingly receive the benefits of Barry's or Leacy's breach of fiduciary duty.

Empire and Outback contend that they are entitled to summary judgment because "Outback never commenced business." (Mem. DSJ 7-8).  However, Empire and Outback note that "Michael Quinn (Empire's controller) signed the lease [for Outback's offices] and Empire paid the rent [for Outback's offices]."  (Reply DSJ 10 n. 9).  Additionally, a shareholder agreement and stock option agreement for Barry and Leacy to become shareholders in Outback was created.  (FSAF Par. 84).

Further, a Certificate of Incorporation for "Outback Imports, Inc." was filed with the New York Secretary of State on July 31, 2002. (FSAF Par. 85). In addition to the certificate of incorporation, on or about September 18, 2002, Foodcomm learned that Barry and Leacy were "trading for or from a New firm in Chicago called Outback Imports," (FSAF Par. 104), and on October 2, 2002, Barry sent an email announcing that he had "launched a company . . . in partnership with Chris Leacy . . . based in Chicago . . . called Outback Imports . . . [that was] importing meats from Australia and trying to sell [the meats] nationally throughout the States." (FSAF Par. 105). Although Empire and Outback contend that "Outback never commenced business," (Mem. DSJ 7-8), and that Outback was merely a shell corporation, questions of fact remain as to whether there were any profits, and if so, whether such went directly to Outback or to the Outback Imports division of Empire.

Empire and Outback also argue that "Empire's representatives . . . had no knowledge that Barry and Leacy allegedly owed fiduciary duties to Foodcomm." (Mem. DSJ 7-8). However, Empire and Outback have not pointed to sufficient facts to warrant summary judgment. Whether Empire was aware that Barry and Leacy owed fiduciary duties to Foodcomm cannot be decided on summary judgment. First, Levine sought legal counsel from Empire's attorney about whether Empire "would run into problems employing" Barry and Leacy. (FSAF Par. 19). Second, Levine gave Empire's attorneys a copy of Leacy's confidentiality agreement with Foodcomm. Third, Levine had a basic understanding that "[e]mployees are supposed to come in, do their job to the best of their ability, and represent the company as

fairly as possible." (R FSAF Par. 21). Based on these facts, it is not clear that a reasonable jury could conclude that Empire did not have knowledge that Barry and Leacy owed fiduciary duties to Foodcomm. Therefore, based on the above, and a review of all the evidence, the issue of unjust enrichment and whether Outback commenced business and whether Empire knew of the fiduciary duties that Barry and Leacy owed to Foodcomm cannot be resolved as a matter of law. Therefore, we deny Defendants' motion for summary judgment on the constructive trust and unjust enrichment claims (Counts IV and VI).

## CONCLUSION

Based on the foregoing analysis, we deny Foodcomm's partial motion for summary judgment and Defendants' partial motion for summary judgment in their entirety.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: November 14, 2006